# FIFTH DIVISION
# RICKMAN, C. J.,
# MCFADDEN, P. J., and SENIOR APPELLATE JUDGE PHIPPS

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**_DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES._**

**September 29, 2021**

# In the Court of Appeals of Georgia

A21A1183. UNIVERSAL INDUSTRIAL GASES, INC. v. ACTION INDUSTRIES, INC. et al.

PHIPPS, Senior Appellate Judge.

In this action for breach of contract and related claims, plaintiff Universal Industrial Gases, Inc. ("UIG") appeals from the dismissal of its complaint against defendants Action Industries, Inc. ("Action") and Allegheny Casualty Company ("Allegheny"). The trial court dismissed UIG's complaint on the ground that UIG is not authorized to maintain this action because it is a foreign entity that has not obtained a certificate of authority to transact business in Georgia. UIG contends on appeal that the trial court erred when it determined that UIG is transacting business in Georgia for purposes of the applicable statutory scheme. For the reasons that follow, we agree and reverse.

Unless otherwise noted, the following facts appear to be undisputed on the current record, at least for purposes of the defendants' motion to dismiss. According to UIG's complaint, it is a corporation organized under the laws of Delaware, with its principal place of business in Pennsylvania. In May 2017, it entered into an Onsite Gases Supply Agreement with non-party Anchor Glass Container Corporation ("Anchor"), in which UIG agreed to: (i) buy real property adjacent to an Anchor facility in Warner Robins; (ii) build an air separation unit ("ASU") plant (to be owned by UIG) on that property; and (iii) use the plant to provide all of Anchor's gaseous oxygen requirements for Anchor's Warner Robins facility for an initial period of 15 years, and for an initial sum of $110,000 monthly. UIG's parent company thereafter organized two Georgia entities – UCG Warner Robins Realty, LLC, and UCG Georgia, LLC, both of which are wholly owned by UIG's parent company – to buy the Warner Robins property and operate the ASU plant located there. In November 2017, Anchor sold the real property at issue here to UCG Warner Robins Realty. In July 2018, UIG assigned to UCG Georgia: (i) all of UIG's "rights, benefits and privileges" under its Onsite Gases Supply Agreement with Anchor; and (ii) all of UIG's "right, title and interest in and to" the ASU plant.

In the August and September 2017 contracts at issue in this lawsuit, UIG hired Action to dismantle an ASU plant in Louisiana and relocate it to Warner Robins, and Allegheny issued a performance bond as Action's surety in connection with the ASU project. This proceeding began in October 2018, when UIG sued the defendants, alleging that Action had breached various obligations under its contract with UIG and that Allegheny was liable to UIG as Action's surety.

The defendants moved to dismiss UIG's complaint on the ground that UIG may not maintain an action in a Georgia court because it has not obtained a certificate of authority to transact business here. UIG opposed the defendants' motion, contending that its temporary activities in Georgia did not rise to the level of "transacting business" for purposes of the certificate-of-authority requirement. The trial court granted the motion to dismiss, concluding that "the extent of activity is considerable and continuity is indicated with respect to UIG's business activities in Georgia" and that UIG's failure to obtain authorization to transact business in Georgia therefore barred its claims against the defendants. (Punctuation omitted.) This appeal followed.[1]

---

[1] UIG filed an application for interlocutory review, which we granted on the ground that the dismissal order is directly appealable because the trial court expressly directed the entry of a final judgment and determined there is no just reason for delay as to the dismissal of UIG's claims against Allegheny. *Universal Indus. Gases, Inc. v. Action Indus., Inc.*, No. A21I0108 (Jan. 19, 2021); see OCGA § 9-11-54 (b); *Spivey*

3

By statute, a foreign corporation transacting business in this state is required to obtain a certificate of authority from the Georgia Secretary of State, subject to certain exceptions that include, as relevant here, "[c]onducting an isolated transaction not in the course of a number of repeated transactions of a like nature." OCGA § 14-2-1501 (a), (b) (10). And a foreign corporation transacting business in Georgia may not maintain a proceeding in a Georgia court until it has obtained the required certificate. OCGA § 14-2-1502 (a).[2] A motion to dismiss for failure to obtain a certificate of authority to do business in Georgia is properly considered a motion in abatement, in which the *defendant has the burden* of proving the facts necessary to obtain a dismissal. *Mfgs. Nat. Bank of Detroit v. Tri-State Glass, Inc.*, 201 Ga. App. 253, 253-254 (1) (410 SE2d 808) (1991); see *Powder Springs Holdings, LLC v. RL*

*v. Hembree*, 268 Ga. App. 485, 486, n. 1 (602 SE2d 246) (2004).

[2] In its dismissal order, the trial court based its ruling on OCGA § 14-11-711 and, by necessary implication, OCGA § 14-11-702, which are parallel statutes that apply the same material requirements and limitations as OCGA §§ 14-2-1501 and 14-2-1502 on foreign LLCs, at least as relevant here. Our analysis relies on the foreign corporation statutes because UIG claimed to be a corporation in its complaint and is identified as a corporation in its contract with Anchor and assignments to UCG Georgia, and, on appeal, neither party has identified any properly authenticated, conclusive record evidence to the contrary. Regardless, the outcome here would be the same under either set of statutes, given the material similarities between their provisions, and we therefore rely on case law addressing both sets of statutes.

4

*BB ACQ II-GA PSH, LLC*, 325 Ga. App. 694, 696-697 (1) (754 SE2d 655) (2014) (addressing the certificate-of-authority requirement in the context of LLCs under OCGA §§ 14-11-702 and 14-11-711).

We review de novo a trial court's ruling on a motion to dismiss raising a matter in abatement. See *Brock v. C & M Motors, Inc.*, 337 Ga. App. 288, 290 (1) (787 SE2d 259) (2016). If, on a motion to dismiss, the trial court conducts an evidentiary hearing, "it may resolve disputed factual issues, and we will show deference to those findings." *Hyperdynamics Corp. v. Southridge Capital Mgmt., LLC*, 305 Ga. App. 283, 284 (I) (699 SE2d 456) (2010) (physical precedent only). On the other hand, where a motion is resolved based solely on written submissions, including deposition transcripts, "the reviewing court is in an equal position with the trial court to determine the facts." Id. at 284 (I) & n. 1 (citation and punctuation omitted); see also *Beasley v. Beasley*, 260 Ga. 419, 420 (396 SE2d 222) (1990). Here, the trial court decided the motion to dismiss based solely on documents already in the record (including deposition transcripts) and counsel's argument during the hearing on the motion. We therefore owe no deference to the trial court's factual findings. See *Beasley*, 260 Ga. at 420; *Hyperdynamics Corp.*, 305 Ga. App. at 284 (I) & n. 1.

Whether one is "transacting business" for purposes of the applicable statutes should be decided on a case-by-case basis "and not by application of a mechanical rule." *Winston Corp. v. Park Elec. Co.*, 126 Ga. App. 489, 495 (191 SE2d 340) (1972) (addressing Code Ann. §§ 22-1401 and 22-1421, the predecessors to OCGA §§ 14-2-1501 and 14-2-1502); accord *Reisman v. Martori, Meyer, Hendricks, & Victor*, 155 Ga. App. 551, 552 (1) (271 SE2d 685) (1980).

> Under such test it is the extent of activities by the foreign corporation in Georgia rather than the singleness that is considered, whether it be a construction enterprise or some other business. Where the activities are minimal and unsubstantial in connection with only one contract and there is displayed no intention to continue these activities after completion of the single contract, the foreign corporation does not have to qualify because its contracts with Georgia relate to an isolated transaction. If such activities are extensive in scope and involve a great deal of work over a period of time, then qualification is required despite all such activities being related to a single contract.

*Winston Corp.*, 126 Ga. App. at 496; see also id. at 491, 494, 496-497 (concluding that a party was not "transacting business" in Georgia for purposes of these statutes where he "was in Georgia completing a subcontract as a sole proprietor," and, after incorporating his business in Tennessee, he "completed the performance of the contract as an individual and in connection therewith undertook additional work in

6

the name of his foreign corporation without intention of doing any further business in Georgia other than the isolated transaction") (punctuation omitted); accord *Barker v. County of Forsyth*, 248 Ga. 73, 75 (1) (281 SE2d 549) (1981) ("[A]n isolated transaction indicates no purpose of continuity of conduct whereas doing business implies an intent to conduct a continuous, as opposed to a temporary, business."); *Reisman*, 155 Ga. App. at 552 (1) ("[T]he purpose of [the predecessor to OCGA § 14-2-1501] is to require registration of foreign corporations which intend to conduct business in Georgia on a continuous basis, not as a temporary matter.").

For example, in *Barker*, 248 Ga. at 73, 75 (1), the Supreme Court held that a foreign corporation was "transacting business" in Georgia for purposes of the predecessors to OCGA §§ 14-2-1501 (a) and 14-2-1502 (a), where the corporation spent over $20,000 (in the 1980s) designing, surveying, and planning a project for an alpine slide on a Georgia mountain; its staff members spent two weeks in Georgia accomplishing some of these tasks; and it entered into an agreement to buy and lease land on the mountain to operate both the slide and a scenic lookout. By way of contrast, in *Powder Springs Holdings, LLC*, 325 Ga. App. at 696-697 (1), this Court concluded that a foreign LLC was not "transacting business" in Georgia for purposes of OCGA § 14-11-702 (a), where the foreign LLC merely acquired the loan

7

documents underlying the foreclosure sale at issue in that proceeding, advertised and conducted the sale, bought the subject property at and reported the sale, and filed a petition confirming the sale in superior court. And in *Roberts v. Chancellor Fleet Corp.*, 182 Ga. App. 69, 70-71 (1) (354 SE2d 628) (1987) (physical precedent only), we held that no certificate of authority was required where the plaintiff, which was in the lease underwriting business: (i) maintained a sales office in Georgia with one sales representative, who solicited orders for the lease of equipment but had no authority to accept contracts on behalf of the plaintiff; and (ii) made deliveries of equipment pursuant to the terms of its lease agreements. With this background, we turn to UIG's claims on appeal.

1. In two related arguments, UIG contends that the trial court erred when it determined that UIG's activity in Georgia is continuous, rather than isolated. In its dismissal order, the trial court identified two factors as central to its decision. First, the court found that, in its complaint, UIG requested consequential damages,[3] which, the court reasoned, "depend upon additional circumstances giving rise to an expectation of profits to be derived from continuing business operations" and thus

---

[3] Consequential damages are "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act." Black's Law Dictionary 489 (11th ed. 2019).

necessarily contemplate "continuing business transactions by UIG flowing from [its Onsite Gases Supply Agreement with Anchor] and the operation of the Warner Robins facility." Second, the court found that the deposition testimony of UIG's president that a UIG employee was the "plant manager" for the Warner Robins ASU plant also indicated "substantial ongoing involvement of UIG in the operation of the Georgia plant." UIG contends that neither factor was a proper basis to support a finding that it is "transacting business" in Georgia for purposes of the certificate-of-authority requirement. We agree.

(a) In the "Facts" section of its complaint, UIG alleged that Action's breach of its contract with UIG has resulted in "consequential damages to UIG from its failure to provide separated gas products to its customers." In its request for relief, however, it sought judgment in the amount of "at least $1,170,306," which represented only

> costs of work paid for within the scope of the Project but not performed by Action, correction of work improperly performed by Action, and increased costs to UIG due to Action's breach, including additional sums UIG has paid or will have to pay to third parties for labor and material necessary to complete the Project according to the Contract,

9

i.e., the "price for the labor done and materials furnished due to Action's breach." None of these items expressly implicate future lost profits, notwithstanding the trial court's implicit finding to the contrary.

Regardless, even if UIG's complaint arguably may be read as seeking lost profits, any such request would show – at most – that UIG potentially may have, at some point in the past, *contemplated* engaging in long-term business activities in Georgia. Any such request sheds little-to-no light, however, on whether UIG in fact ever "transacted business" in Georgia, much less that it did so at any point after it transferred all of its rights in the ASU plant and Onsite Gases Supply Agreement to UCG Georgia (by which time UCG Warner Robins Realty already had acquired the land on which the plant sits), including when it subsequently filed its complaint in this case or at any other point thereafter.[4]

---

[4] In other words, the very nature of a successful claim for lost profits necessarily shows that business *intended* – at some point in the past – to be transacted was not ultimately transacted. Of course, asking for and proving damages from lost profits are two very different propositions. But even if lost future profits were to be established, the amount of profit, standing alone, is insufficient to show that an entity in fact transacted business in Georgia so as to trigger the registration requirement, see *Ovation Mktg., Inc. v. Sturz*, No. 1-07-CV-1634-JEC, 2008 U.S. Dist. LEXIS 131381, at *8-10 (II) (A) (N.D. Ga. 2008), given that lost future profits necessarily depend on business not transacted.

10

Notably, the statute under which the defendants seek dismissal of this action – OCGA § 14-2-1502 (a) – bars a foreign corporation from "maintain[ing] a proceeding in any court in this state" only if the corporation is "transacting business" in Georgia, i.e., actively doing so, without a certificate of authority. Thus, by its very terms, the plain language of the statute does not encompass a foreign corporation that merely may have contemplated potentially engaging in long-term business activities in this state at some point before the court proceeding at issue.[5] See generally *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (when considering the meaning of a statute, a court must "presume that the General Assembly meant what it said and said what it meant" and afford the statutory text its "plain and ordinary meaning") (citations and punctuation omitted). And that is what distinguishes this case from *Barker*, in which the foreign corporation was, at the time of the lawsuit (and appeal) "proposing to conduct a continuous business," insofar as it had obtained

---

[5] In that vein, the plain language of the statute – which uses the present participle "transacting" – does not even encompass a foreign corporation that may have actively "transacted business" in this state at some point in the past but ceased doing so before initiating the court proceeding at issue. For that reason, we reject the defendants' conclusory assertion – unsupported by citation to authority – that the transactions between UIG and its two affiliates (which occurred well before this case began) "were ipso facto examples of UIG transacting business in Georgia" for purposes of the certificate-of-authority requirement. (Emphasis and punctuation omitted.)

11

(or was then presently in the process of obtaining) several parcels of land on a Georgia mountain, with then-present plans to operate – on its own behalf – an alpine slide and scenic overlook in Georgia. See 248 Ga. at 73, 75 (1). By way of contrast, the record here shows that, well before it initiated this action, UIG had divested itself of all of its interest in the land, plant, and business activities at issue in this case. Consequently, even assuming that UIG's complaint may be read to request future lost profits, the trial court erred in relying on any such request as a basis for its ruling that UIG is "transacting business" in Georgia for purposes of the certificate-of-authority requirement.

(b) UIG president Samuel Piazza, Sr., testified in a deposition that a UIG employee named Frank McDougal was the "plant manager" for the Warner Robins ASU plant. As of the date of Piazza's November 2019 deposition, McDougal had been in that position, based in Georgia, for approximately 18 months. Piazza provided no more information regarding McDougal's activities or responsibilities.

When viewed in context with UIG's assignment to UCG Georgia of its Onsite Gases Supply Agreement and the ASU plant, the fact that a single UIG employee acted as the ASU plant manager from mid-2108 through late 2019, without more, also sheds little-to-no light on whether UIG itself conducted any activities that would

constitute "transacting business" in Georgia at any point after the assignments or during the pendency of this action. See *Roberts*, 182 Ga. App. at 70-71 (1) (the presence in Georgia of a sales representative who solicited lease orders and made deliveries of leased equipment did not constitute "transacting business" in Georgia for purposes of the certificate-of-authority requirement). This factor thus also was not a sufficient basis for the trial court's dismissal ruling.

(c) In its dismissal order, the trial court highlighted that "neither of the UCG companies" – i.e., UCG Georgia and UCG Warner Robins Realty – "was in existence when the [Onsite Gases] Supply Agreement was executed." To the extent that the trial court intended to rely on this fact as a basis for its ruling that UIG is "transacting business" in Georgia for purposes of the certificate-of-authority requirement, that ruling also was in error. For reasons similar to those discussed in Division 1 (a) above, this fact – at most – suggests that UIG potentially may have contemplated, well before it filed this action, engaging in long-term business activities in Georgia. Contemplating such activities and actually engaging in them are, of course, two very different propositions.

(d) In sum, the current record indicates that UIG's activities in Georgia have been limited to coordinating the construction of the Warner Robins ASU plant, an

13

isolated project that is not consistent with continuous and ongoing transaction of business in this state. See OCGA § 14-2-1501 (b) (10) ("[c]onducting an isolated transaction not in the course of a number of repeated transactions of a like nature" does not constitute "transacting business" for purposes of the statute); *Barker*, 248 Ga. at 75 (1) ("doing business" implies "*continuity* of conduct," i.e., "an intent to conduct a *continuous, as opposed to a temporary, business*") (emphases supplied); *Reisman*, 155 Ga. App. at 552 (1) (the certificate-of-authority requirement applies to foreign entities that "intend to conduct business in Georgia on a *continuous basis, not as a temporary matter*") (emphasis supplied); *Winston Corp.*, 126 Ga. App. at 496 (no certificate of authority is required where a business's activities show "*no intention to continue* [the] activities after completion of [a] single contract") (emphasis supplied). Moreover, it is undisputed that UIG has not owned the Warner Robins ASU plant or the land on which it sits and has had no rights under the Onsite Gases Supply Agreement with Anchor since well before this action began.[6] And to the

---

[6] Even if it were to be established that UIG directly or indirectly owns or controls UCG Warner Robins Realty and/or UCG Georgia, under the plain terms of the statute, that would not be enough, standing alone, to require UIG to obtain a certificate of authority to transact business in Georgia. See OCGA § 14-2-1501 (b) (13) (providing that "[o]wning (directly or indirectly) an interest in or controlling (directly or indirectly) another entity organized under the laws of, or transacting business within, this state" does not constitute "transacting business" for purposes of

14

extent that – as the defendants suggest – UIG arguably may still, in the abstract, have

some obligations to Anchor under the supply agreement, the defendants have pointed

to nothing in the record showing that UIG ever has provided product to Anchor

pursuant to the agreement, much less that it has done so at any point during the

pendency of this proceeding.[7] We will not cull the record on the defendants' behalf

in this regard. See *Ellison v. Burger King Corp.*, 294 Ga. App. 814, 815 (1) (670

SE2d 469) (2008) ("[W]e decline to look in the record for matters which should have

been set forth in the brief.").

---

the certificate-of-authority requirement); see also generally *Yukon Partners, Inc. v. The Lodge Keeper Group, Inc.*, 258 Ga. App. 1, 5 (572 SE2d 647) (2002) ("The law of corporations is founded on the legal principle that each corporation is a separate entity, distinct and apart from its stockholders. . . . And a member of a limited liability company similarly is considered separate from the company and is not a proper party to a proceeding by or against a limited liability company, solely by reason of being a member of the limited liability company . . . .") (citations and punctuation omitted).

[7] To the contrary, statements made by attorneys for Action and by the trial court during the hearing on the defendants' motion to dismiss suggest that the ASU plant is not providing (and may have never provided) any product to Anchor. In fact, in their motion to dismiss and appellate brief, the defendants – who bear the burden of showing that UIG may not maintain this action – have pointed to no record evidence indicating that the plant (much less UIG) currently is supplying product to any customers.

15

We again emphasize that it is the defendants – who seek to prevent UIG from having its day in court – who bear the burden of showing that UIG is improperly "maintain[ing] a proceeding" in Georgia while simultaneously "transacting business in this state." See OCGA § 14-2-1502 (a); *Powder Springs Holdings, LLC*, 325 Ga. App. at 696-697 (1). And for the above reasons, they have not met this burden. Accordingly, the trial court erred when it granted the defendants' motion to dismiss.

2. Given our ruling in Division 1, we do not address: (i) UIG's alternative contention that the defendants waived, by failing to raise in their answer, their claim that UIG's failure to obtain a certificate of authority bars it from maintaining this action; or (ii) the defendants' claim that UIG waived that argument by failing to adequately raise it below. Should the defendants, upon further development of the factual record, again seek the dismissal of this action due to UIG's failure to obtain a certificate of authority, the trial court should address any such waiver issues that are properly before it in the first instance. See generally *9766, LLC v. Dwarf House, Inc.*, 331 Ga. App. 287, 291 (4) (b) (771 SE2d 1) (2015) ("This court is for the correction of errors, and where the trial court has not ruled on an issue, we will not address it.") (citation and punctuation omitted).

For each of the above reasons, the judgment of the trial court is reversed, and this case is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. Rickman, C. J., and McFadden, P. J., concur.*